Filed 5/22/14  P. v. Scott CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038448 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 212037) |
| v. | |
| WENDELL CHRIS SCOTT, | |
| Defendant and Appellant. | |

A jury convicted defendant Wendell Chris Scott of six counts of lewd conduct on a child under 14 (Pen. Code, § 288, subd. (a))[1] and found true allegations that he committed the acts against more than one victim within the meaning of section 667.61, subdivisions (b) and (e).  He was sentenced to 30 years to life in prison.

On appeal, defendant contends that the trial court (1) improperly imposed an AIDS testing requirement, (2) erroneously assessed an AIDS education fine, and (3) erroneously imposed a $300 section 290.3 fine.  He also contends that his trial counsel rendered ineffective assistance by failing to object to the imposition of a $240 restitution fine.  Finally, he asks that we review sealed documents to determine whether the trial court inappropriately denied him access to mental health records relevant to impeaching the credibility of one of his victims.  We modify and affirm the judgment.

---

[1]     Subsequent statutory references are to the Penal Code unless otherwise noted.

# I. Background

Jennifer Doe moved into defendant's house with her three daughters in 2002. M. Doe was 11. B. Doe was nine. I. Doe was four. Defendant had pornographic movies, books, and magazines in the house. He found M. Doe looking at one of the magazines when she was 12. He allowed her to watch "any movies [she] wanted or look at any magazines . . . ." He photographed her in little or no clothing on numerous occasions when she was 12. He touched her breast during one photo session, "trying to make it seem like he was fiddling with the towel around me." He did not show her the photos.

M. Doe watched pornographic movies with defendant after school or late at night. He "started . . . caressing [her] crotch area" over her pajamas and "tried to . . . go underneath [her] pants" one time when she was 12 but she stopped him. They were playing cards another time when defendant started making "weird noises" as if in pain. He told her that his penis hurt and asked her to rub it "to make it feel better." She "believed he was actually in pain . . . [s]o I did it." When she was 13, defendant called her outside and "asked me if I would allow him to perform oral sex on me and he could videotape it." She was "taken aback" and told him no. She avoided him after that. She did not tell anybody about the molestations because "I didn't want us to get taken away from my mom."

B. Doe started watching pornographic movies with defendant when she was 11. They watched "[m]ostly at night, . . . when . . . everybody was asleep." She did not tell her mother because defendant said "bad things would happen" if she did. Defendant digitally penetrated B. Doe when she was 11. They were watching a pornographic movie. She recalled "[m]ore than twenty" similar incidents when she was 11. Defendant orally copulated her on one of these occasions. That incident lasted "like over thirty minutes but not more than an hour." B. Doe did not tell her mother or her sisters about the molestations.

2

B. Doe went to live with her biological father in Roseville in 2005. Her mother moved out of defendant's house later that year. B. Doe moved back to San Jose in November 2005. There was no room in her mother's small apartment so she had to move into defendant's house. B. Doe recalled "no more than three" incidents of digital penetration during the month that she lived with defendant after her return from Roseville. It was "terrifying" to be alone in the house with him. She stopped doing her chores and "made messes everywhere" to give him a reason to kick her out. He did so after a month and she went to live with her mother.

In 2006, federal agents investigating the trafficking of child pornography seized a computer and other items from defendant's home. He wrote a statement admitting possession of child pornography that same day.

B. Doe spent "a lot" of time at her friend Sara's house and it became an issue between her and her mother. The issue came up in a family therapy session with B. Doe, her mother, and defendant in April 2007. B. Doe was 14. Things got "very heated." Her mother was "yelling a lot." B. Doe was "very much cowed" and asked to speak to the therapist in private. She told the therapist that defendant had molested her. The therapist "brought him in and my mom and she told them right there as if nothing would happen." B. Doe "thought [defendant] was going to jump across the room and kill me, like just go off." Her mother did not believe her. The therapist reported the molestations to Child Protective Services. B. Doe was interviewed by a sexual assault investigations officer. She was placed in a group home until she turned 18.

M. Doe learned in 2007 that defendant molested B. Doe. She did not tell anyone that he also molested her. It was "a coping mechanism" to "just pretend like nothing ever happened." She was "afraid that -- it happened anyways but my sister and myself would be taken away. They had already taken away [B. Doe] . . . ." M. Doe did not disclose that defendant molested her until shortly before his trial in this matter.

3

In 2008, defendant learned that federal charges would be filed against him. On February 7, 2011, he was convicted by plea of possession of child pornography (18 U.S.C. § 2252, subd. (a)(4)(B). He was serving a five-year sentence for the federal conviction when he was tried in this case.

M. Doe, B. Doe, and Jennifer testified for the prosecution. Police officers and federal agents described their investigations. Carl Lewis testified as an expert on Child Sexual Abuse Accommodation Syndrome and investigation of child sexual abuse.

The family therapist to whom B. Doe disclosed the abuse and the sexual assault team officer who interviewed B. Doe were called as witnesses for the defense. Annette Ermshar testified as an expert on Child Sexual Abuse Accommodation Syndrome and forensic psychology. Defendant testified in his own behalf. He denied finding M. Doe looking at pornographic magazines. He denied watching pornographic movies with M. Doe or B. Doe. He categorically denied ever touching M. Doe or B. Doe inappropriately.

After deliberating for less than four hours, the jury returned guilty verdicts on all counts and found the enhancement allegations true. Defendant was sentenced to 30 years to life in prison. He filed a timely notice of appeal.

## II. Discussion

## A. AIDS Testing

Defendant contends that the trial court improperly ordered him to submit to an AIDS test pursuant to section 1202.1. We disagree.

"Involuntary AIDS or human immunodeficiency virus (HIV) testing is strictly limited by statute." (*People v. Guardado* (1995) 40 Cal.App.4th 757, 763 (*Guardado*). Section 1202.1 requires the court to order "every person . . . convicted of . . . a sexual offense listed in subdivision (e) . . . to submit to a blood or oral mucosal transudate saliva test for evidence of antibodies to the probable causative agent of acquired immune

4

deficiency syndrome (AIDS) within 180 days of the date of conviction." (§ 1202.1, subd. (a).) Conviction of a sexual offense listed in subdivision (e) automatically triggers mandatory testing. (§ 1202.1, subd. (e)(1)-(5).) Oral copulation in violation of section 266c or section 288a is one such offense. (§ 1202.1, subd. (e)(5).) Certain other crimes constitute sexual offenses within the meaning of the statute "if the court finds that there is probable cause to believe that blood, semen, or any other bodily fluid capable of transmitting HIV has been transferred from the defendant to the victim." (§ 1202.1, subd. (e)(6).) Lewd conduct on a child in violation of section 288 is included in this latter category. (§ 1202.1, subd. (e)(6)(A)(iii).)

Section 1202.1 requires the court to "note its [probable cause] finding on the court docket and minute order if one is prepared." (§ 1202.1, subd. (e)(6)(B).) If a court orders AIDS testing under section 1202.1, subdivision (e)(6) without an express finding of probable cause, a defendant's failure to object on that ground forfeits appellate review of a claim that the lack of an express finding rendered the order unlawful. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) "Nevertheless, because the terms of the statute condition imposition on the existence of probable cause, the appellate court can sustain the order . . . if it finds evidentiary support, which it can do simply from examining the record." (*People v. Butler* (2003) 31 Cal.4th 1119, 1127 (*Butler*).) "Probable cause is an objective legal standard—in this case, whether the facts known would lead a person of ordinary care and prudence to entertain an honest and strong belief that blood, semen, or any other bodily fluid capable of transmitting HIV has been transferred from the defendant to the victim." (*Ibid.*)

Defendant argues that the AIDS testing requirement must be stricken because the trial court did not make a finding of probable cause and "there was no evidence that any exchange of bodily fluids occurred in this case." We cannot agree.

We find sufficient evidence to support an implied finding of probable cause. The Legislature has recognized that oral copulation can result in a transfer of bodily fluid

5

capable of transmitting HIV.  (§ 1202.1, subd. (e)(5).)  B. Doe testified at trial that defendant "performed oral sex on me."  "[S]uddenly he used his mouth on me."  She told the jury that defendant began by touching her as he watched a pornographic movie.  He then digitally penetrated and orally copulated her.  "It was like a mixture."  She was sitting on the couch and he was "[o]n the floor in front of me."  The incident lasted "like over thirty minutes, but not more than an hour."  It seemed like a long time to her.

The prosecutor highlighted the incident involving oral copulation during her closing argument.  She emphasized that defendant "could have been charged twenty or so times.  He's been charged with three and there [are] specifically three instances [that B. Doe] recalls in detail."  The third such incident was "Count 6.  Digital penetration and oral copulation.  This time he's rubbing her vagina as is usual.  Inserting his fingers into her, as is usual.  Then . . . he . . . put his mouth on her . . . ."

Defendant categorically denied that he ever orally copulated B. Doe.  He agreed with the prosecutor "that someone here is lying" and that the options were that either he was lying or M. Doe, B. Doe, and Jennifer were lying.  Both counsel argued in closing that the case "boil[ed] down to credibility."  The verdicts show that the jury believed B. Doe's testimony beyond a reasonable doubt.  Given B. Doe's testimony, the jury's verdicts, and the Legislature's recognition that oral copulation can result in a transfer of fluid capable of transmitting HIV, we conclude that there was sufficient evidence to support an implied finding of probable cause here.  (§ 1202.1, subd. (e)(6); (*Butler*, *supra*, 31 Cal.4th at p. 1127.)  The trial court did not err in ordering defendant to submit to an AIDS test.

### B.  AIDS Education Fine

Defendant contends that the trial court improperly imposed a $70 AIDS education fine against him pursuant to section 288a, subdivision (m).  The Attorney General concedes that the fine and the attendant $210 penalty assessment must be stricken.  We

6

accept the Attorney General's concession. Section 288a, subdivision (m) authorizes imposition of an AIDS education fine not to exceed $70 against persons convicted of violating section 288a. (§ 288a, subd. (m).) Defendant was convicted of violating section 288, subdivision (a). Section 288, subdivision (a) does not authorize imposition of an AIDS education fine. The $70 fine and the $210 penalty assessment must be stricken.

### C. Section 290.3 Fine

Defendant contends that the $300 section 290.3 fine was an ex post facto assessment. He argues that the fine must be reduced because the crimes on which it was based ended in 2005. The statutory fine at the time was $200. Defendant also argues that the $900 the trial court imposed in penalty assessments must be recalculated. We agree.

"Article I, section 10, clause 1 of the federal Constitution and article I, section 9 of the state Constitution prohibit the passage of ex post facto laws. [Citation.] California's ex post facto law is analyzed in the same manner as the federal prohibition. [Citation.] '[T]he ex post facto clauses of the state and federal Constitutions are "aimed at laws that 'retroactively alter the definition of a crime or increase the punishment for criminal acts.'"' [Citations.]" (*People v. Alford* (2007) 42 Cal.4th 749, 755.) "Fines arising from convictions are generally considered punishment." (*Id.* at p. 757.) In determining whether a fine or penalty assessment increases the punishment for a criminal act, the court must consider "'whether the Legislature intended the provision to constitute punishment, and, if not, whether the provision is so punitive in nature or effect that it must be found to constitute punishment despite the Legislature's contrary intent.'" (*Ibid.*) Section 290.3 provides that persons convicted of specified offenses "shall . . . be punished by a fine . . . ." Thus, the fine that section 290.3 imposes is punitive on its face.

Section 290.3 as originally enacted required a $200 fine for a defendant's first conviction and a $300 fine for each subsequent conviction. (Former § 290.3, subd. (a);

7

Stats. 1995, ch. 91, § 121.) The fines were raised to $300 and $500 on September 20, 2006. (Former § 290.3, subd. (a); Stats. 2006, ch. 337, § 18; see Historical and Statutory Notes, 48 West's Ann. Pen. Code (2013 Supp.) foll. § 290.3, p. 138.)

It was undisputed that defendant's molestation of M. Doe and B. Doe ended in 2005. This was almost a year before the section 290.3 fines were raised to $300 and $500. Thus, imposition of a $300 fine violated the constitutional prohibition against ex post facto punishment. (*People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1249 (*Valenzuela*).) The $300 fine must be reduced to $200, the amount statutorily authorized when defendant committed his crimes. (*Ibid*.)

The Attorney General disagrees. She points out that former section 290.3 specified a $300 fine for repeat offenders. She argues that defendant "could be considered a repeat offender" because his federal conviction for possession of child pornography subjected him to the registration requirements of section 290. We cannot agree.

The problem with the Attorney General's reasoning is that defendant was not a repeat offender when he molested M. Doe and B. Doe. Those molestations ended in 2005. Federal agents did not seize defendant's computer until November 2, 2006. Judgment was entered against him on February 7, 2011. Thus, he was a first time offender when he molested M. Doe and B. Doe. Former section 290.3's repeat offender fine could not properly be applied to him.

Defendant contends that the penalty assessments on his section 290.3 fine must also be recalculated. We agree.

Our discussion of the statutory basis for each penalty assessment references the statute in effect when defendant committed his crimes. (See *People v. Batman* (2008) 159 Cal.App.4th 587, 590-591.) Section 290.3 fines were subject to a 100 percent state penalty assessment ("ten dollars ($10) for every ten dollars ($10) or fraction thereof") under former section 1464. (Former § 1464, subd. (a).) They were also subject to a 20

percent state surcharge under former section 1465.7.  (Former § 1465.7, subds. (a), (b).)  They were also subject to a 10 percent penalty for implementation of the DNA Fingerprint, Unsolved Crime and Innocence Protection Act.  (Former Gov. Code, § 76104.6, subd. (a).)  When these assessments are recalculated based on a $200 section 290.3 fine, the penalty amounts are $200 under former section 1464, $40 under former section 1465.7, and $30 under former Government Code section 76104.6.

Section 290.3 fines were also subject to county penalty assessments.  Subdivision (a) of former Government Code section 76000 imposed a 70 percent ("seven dollars ($7) for every ten dollars ($10) or fraction thereof") penalty assessment.  (Former Gov. Code, § 76000, subd. (a).)  Subdivision (e) of that section provided that the $7.00 penalty "shall be reduced in each county by the additional penalty amount assessed by the county for the local courthouse construction fund established by Section 76100 as of January 1, 1998, when the money in that fund is transferred to the state under Section 70402.  The amount each county shall charge as an additional penalty under this section shall be as follows:  [¶] . . . [¶]  Santa Clara $5.50."  (Former Gov. Code, § 76000, subd. (e).)  Thus, the penalty assessment in Santa Clara County under former Government Code section 76000 was $5.50 of every $10.00 or 55 rather than 70 percent.  This was the amount that the Santa Clara County Board of Supervisors "allocated for purposes *other than courthouse construction.*"  (See *People v. McCoy* (2007) 156 Cal.App.4th 1246, 1254 (*McCoy*).)  The remaining $1.50 of every $10.00 was the amount allocated by the Santa Clara County Board of Supervisors for local courthouse construction.  (*Ibid.*; former Gov. Code, § 76000, subd. (e).)  When recalculated based on a $200 section 290.3 fine, the Government Code section 76000 penalty is $110.

Former Government Code section 70372 imposed a 50 percent ("five dollars ($5) for every ten dollars ($10) or fraction thereof") state court construction penalty.  (Former Gov. Code, § 70372, subd. (a).)  When recalculated based on a $200 section 290.3 fine, the Government Code section 70372 penalty is $100.

9

There are certain penalty assessments in effect now that were not in effect when defendant committed his crimes. The DNA Identification Fund penalty went into effect on July 12, 2006. (Former Gov. Code, § 76104.7; Stats. 2006, ch. 69, § 18.) The emergency medical services penalty went into effect on September 30, 2006. (Former Gov. Code § 76000.5; Stats. 2006, ch. 841, § 1.) Neither applies here.

To sum up, the judgment must be modified to reflect a section 290.3 fine of $200 and a total of $480 in penalty assessments attached to the section 290.3 fine, specifically, (1) $200 under former section 1464, (2) $40 under former section 1465.7, (3) $30 under former Government Code section 76104.6, (4) $110 under former Government Code section 76000, and (5) $100 under former Government Code section 70372.

### D. Ineffective Assistance of Counsel

Defendant contends that his trial counsel rendered ineffective assistance by failing to object to the trial court's imposition of a $240 restitution fund fine under former section 1202.4 and a corresponding $240 parole revocation fine under former section 1202.45. He notes that the trial court expressed its intent to impose the statutory minimum fine, which did not increase from $200 to $240 until 2012. He argues that the court's imposition of the higher minimum mandated by a later version of the statute violated the constitutional prohibition against ex post facto punishment. He maintains that "there was no conceivable reason" for his trial counsel's failure to object to the prosecutor's mistaken representation to the court that the statutory minimum fine was $240. We agree.

A defendant seeking reversal for ineffective assistance of counsel must prove by a preponderance of the evidence that his counsel's performance was deficient and that his defense was prejudiced by those deficiencies. (*People v. Ledesma* (1987) 43 Cal.3d 171, 218; *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) When counsel's conduct can reasonably be attributed to sound strategy, a reviewing court will presume

10

that the conduct was the result of a competent tactical decision, and [the] defendant must overcome that presumption to establish ineffective assistance. (*Strickland*, at p. 690.)

The version of section 1202.4 in effect at the time of defendant's crimes provided that "[i]n every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record. [¶] . . . The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000), if the person is convicted of a felony . . . ." (Former § 1202.4, subd. (b); Stats. 2004, ch. 223, § 2.) Former section 1202.45 required the court to "assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4. This additional parole revocation restitution fine shall be suspended unless the person's parole is revoked." (Former § 1202.45, subd. (a); Stats. 2004, ch. 223, § 4.) The minimum restitution fund fine was raised to $240 on January 1, 2012. (Former § 1202.4, subd. (a); Stats. 2011, ch. 358, § 1.)

The probation report recommended imposition of a $10,000 restitution fund fine. At sentencing, the trial court said, "I am going to reduce the restitution fine. The minimum is -- is it $200?" The prosecutor replied that he believed the minimum fine was $240. Defendant's trial counsel said nothing. The court then stated, "$240. And that is being done for a couple of reasons: One, Mr. Scott's financial situation in light of his custodial status. And also, if there is any money that can be in any way collected from Mr. Scott, I would rather have it paid toward restitution. [¶] An additional restitution fine in an equal amount is imposed pursuant to 1202.4 . . . and suspended pursuant to 1202.45 . . . ."

Although the trial court had the discretion to impose a higher fine, the record in this case makes it abundantly clear that the court intended to impose the statutory

11

minimum fine. The problem is that it imposed the statutory minimum fine under the wrong version of section 1202.4. The minimum fine at the time of defendant's crimes was $200, not $240. (Former § 1202.4, subd. (b).) On the facts of this case, imposition of a $240 fine violated the constitutional prohibition against ex post facto punishment. (*People v. Souza* (2012) 54 Cal.4th 90, 143.)

Defense counsel should have objected to the trial court's error. (*People v. Le* (2006) 136 Cal.App.4th 925, 935-936 (*Le*).) As a general rule, "the failure to object is a matter of trial tactics that an appellate court will seldom second-guess . . . ." (*People v. Carter* (2003) 30 Cal.4th 1166, 1209.) But an exception applies when "there simply could be no satisfactory explanation." (*Id*. at p. 1211.) Here, the trial court intended to impose the minimum fine and expressly sought the parties' input on what that minimum was. The mistake originated with the prosecutor, not with the court. In these circumstances, there can be no satisfactory explanation for defense counsel's failure to object to the trial court's imposition of a fine that exceeded the statutory minimum.

We reject the Attorney General's argument that counsel "could have had a tactical reason for choosing not to contest such a de minimus difference ($40) in light of the substantial reduction in sentence he was requesting." We cannot agree with the suggestion that pointing out a clear error would have affected the trial court's other sentencing decisions to defendant's detriment. This is particularly so where the court expressly invited counsel to clarify the statutory minimum fine amount. Nor do we agree with the Attorney General's argument that defense counsel could reasonably have chosen to focus his energies on other issues "rather than researching the legislative history of a statute that was only going to save [defendant] $40." As our high court has observed, "a defense attorney who fails to adequately understand the available sentencing alternatives, promote their proper application, or pursue the most advantageous disposition for his client may be found incompetent. [Citations.]" (*People v. Scott* (1994) 9 Cal.4th 331, 351.) There was no need for exhaustive research here. Defense counsel could have told

the court that he was not sure what the minimum fine was when defendant committed his crimes. Had he done so, it would have taken only a moment to check the language of the former statute.

In *Le*, the trial court clearly expressed an intent to calculate the restitution fund fine " 'under the formula permitted by [section] 1202.4.' " (*Le*, *supra*, 136 Cal.App.4th at p. 932.) But the court misapplied the formula, which resulted in much larger restitution fund and parole revocation fines. This court held that the trial court's misapplication of the statute was error and that defense counsel's failure to object constituted ineffective assistance. (*Le*, at pp. 934-936.) The same reasoning applies here. Here, the trial court unequivocally expressed its intent to impose the statutory minimum restitution fund fine. It initially (and correctly) identified the statutory minimum as $200. It invited the parties' input. The prosecutor's mistaken representation and defense counsel's apparent acquiescence in that mistaken representation caused the court to believe that the minimum fine was not $200 but instead $240. As in *Le*, the error was prejudicial because there was "a reasonable probability" that the trial court would have imposed the smaller restitution fine and a smaller corresponding parole revocation fine had defendant's trial counsel pointed out the error. (*Strickland*, *supra*, 466 U.S. at p. 694; *Le*, at pp. 935-936.)

Defendant asks us to modify the judgment to state the proper amount of the fines. We will reduce the restitution fund fine and the corresponding parole revocation fine to $200 each. (Former § 1202.4, subdivision (b), former §1202.45; see *Le*, at p. 936.)

### E. Review of B. Doe's Mental Health Records
#### 1. Background

The defense subpoenaed B. Doe's mental health records before trial on the ground that they "would have a direct bearing on the credibility of [B. Doe] and may prove exculpatory for [defendant]." The prosecution moved to quash the subpoena. The defense responded with a motion to release the records. The trial court conducted an in

camera review on the day it heard motions in limine. It determined that some but not all of the records were responsive and relevant and should be provided to the defense. The court ruled with respect to those records that defendant's right to present a defense trumped B. Doe's Evidence Code section 1014 and Welfare & Institutions Code section 5328 rights to keep the records confidential. The court withheld the remaining records.

## 2. Analysis

Defendant asks that we review the records that the trial court withheld to determine whether he was "inappropriately deprived . . . of access to any documents relevant to the impeachment of [B. Doe's] credibility." The Attorney General acknowledges that such review is appropriate under *People v. Hammon* (1997) 15 Cal.4th 1117 (*Hammon*) and *Davis v. Alaska* (1974) 415 U.S. 308. We agree.

In *Hammon*, the California Supreme Court declined to "extend the defendant's Sixth Amendment rights of confrontation and cross-examination to authorize pretrial disclosure of privileged information." (*Hammon*, *supra*, 15 Cal.4th at p. 1128.) But the court also recognized that "[w]hen a defendant proposes to impeach a critical prosecution witness with questions that call for privileged information, the trial court may be called upon . . . to balance the defendant's need for cross-examination and the state policies the privilege is intended to serve." (*Hammon*, at p. 1127.) We review the trial court's ruling for abuse of discretion. (*People v. Jackson* (2003) 110 Cal.App.4th 280, 291.)

The documents that the trial court ruled were not discoverable were sent to this court under seal. We reviewed them and found nothing relevant to impeaching B. Doe's credibility. We conclude that the trial court properly declined to release the remaining documents to the defense. No abuse of discretion appears.

## III. Disposition

The judgment is modified to reflect a sex offender fine of $200 under former section 290.3.

14

The judgment is further modified to reflect a total of $480 in penalty assessments attached to the section 290.3 fine, specifically, (1) $200 under former section 1464, (2) $40 under former section 1465.7, (3) $30 under former Government Code section 76104.6, (4) $110 under former Government Code section 76000, and (5) $100 under former Government Code section 70372.

The judgment is further modified to reflect a $200 restitution fund fine under former section 1202.4, subd. (b) and a stayed $200 parole revocation fine under former section 1202.45, subd. (a).

The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

As modified, the judgment is affirmed.


_____
Mihara, J.


WE CONCUR:




_____
Premo, Acting P. J.




_____
Grover, J.


15